664 F.2d 1263
 27 Fair Empl.Prac.Cas. 1075,
27 Empl. Prac. Dec. P 32,386,
2 Employee Benefits Ca 2249
Truett ALFORD, et al., Plaintiffs-Appellees,
v.
CITY OF LUBBOCK, TEXAS and Texas Municipal Retirement
System, Defendants-Appellants.
 No. 80-1192.
 United States Court of Appeals,
Fifth Circuit.
 
 Unit A*
 Jan. 4, 1982.
 James P. Brewster, Asst. City Atty., John C. Ross, City Atty., David W. Reagan, Asst. City Atty., Lubbock, Tex., for city of Lubbock.
 Gaynor Kendall, Austin, Tex., for Texas Municipal Retirement System.
 Thomas J. Griffith, Ralph H. Brock, Lubbock, Tex., for plaintiffs-appellees.
 Appeals from the United States District Court for the Northern District of Texas.
 Before INGRAHAM, POLITZ and WILLIAMS, Circuit Judges.
 JERRE S. WILLIAMS, Circuit Judge:
 
 
 1
 Appellant City of Lubbock, Texas (City) elected in 1950 to participate in a retirement and pension program created by the Texas Legislature and administered by an agency of the State of Texas, appellant Texas Municipal Retirement System (TMRS). The TMRS retirement plan, Tex.Rev.Civ.Stat.Ann. art. 6243h, § VII(1)(a) (Vernon 1970 & Supp. 1980-1981), provides that a covered employee is eligible for service retirement once the employee has attained the age of sixty and has completed fifteen years of service. Most Texas cities, prior to changes in federal age discrimination law,[1] required their employees to retire at the end of the month in which they reached age sixty-five. Not wishing to administer contributions from and, eventually, refunds to employees who could not expect to meet the fifteen-year service requirement, TMRS prior to 1979 excluded from membership any employee hired after his fiftieth birthday.[2] 1949 Tex.Gen.Laws, ch. 24, § III(2)(b) at 27. In addition to its voluntary participation in TMRS, the City has followed a separate policy of compensating in cash all employees who retire under the TMRS program for up to ninety days of unused sick leave.
 
 
 2
 On December 31, 1977, the last day of the year in which they reached sixty-five, appellees Truett Alford and Walter Nierlich were involuntarily retired from their jobs with the City. Because each man had been over age fifty when hired, neither was eligible for membership in TMRS and neither received any pension benefits. Moreover, the City refused to pay them for their unused sick leave even though both had accumulated more than ninety days. Alford had worked for the City twelve years and ten months at the time of his retirement. Nierlich, however, had hired on at age fifty in November of 1962 and thus had been employed by the City fifteen years and one month at the time of his involuntary retirement. Since 1965, the City has followed the rather unusual practice of retiring employees at the end of the calendar year, rather than at the end of the month, in which the employee turns sixty-five.[3] Thus, it has long been possible that an employee hired just after his fiftieth birthday could work over fifteen years and yet not be eligible for retirement under TMRS. This explains why appellant Nierlich worked over fifteen years but was not in the retirement system.
 
 
 3
 Alford and Nierlich brought suit in federal district court against the City and TMRS, alleging that the defendants' actions in retiring them with no pension benefits and refusing them cash compensation for their accumulated sick leave violated the equal protection clause of the Fourteenth Amendment and the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621-634. They also asserted pendent jurisdiction over claims arising under article 1, section 3 of the Texas Constitution and under Tex.Rev.Civ.Stat.Ann. art. 6252-14 (Vernon 1970).[4]
 
 
 4
 The district court held that the exclusion of Alford and Nierlich from the TMRS pension plan had not violated the ADEA, but nevertheless had denied appellants the equal protection of the laws under both the federal and state constitutions. Alford v. City of Lubbock, 484 F.Supp. 1001, 1005-07 (N.D.Tex.1979). It ordered the City and TMRS to pay appellees their pension benefits as if they had been members of TMRS since their hiring, on the condition that the two former employees make contributions equal to those they would have made had they belonged to the plan from the beginning. Id. at 1007. The district court also held that the City's denial of cash compensation for accrued sick leave violated the ADEA and ordered the City to pay both Alford and Nierlich ninety days of accumulated sick leave with interest. Id. at 1005. On appeal, the City and the TMRS challenge the district court's decision that the involuntary retirement of appellants with no pension benefits constituted a denial of equal protection. They also maintain that their refusal to pay older workers not eligible for a TMRS pension for accrued sick leave does not violate the ADEA.
 
 I. EXCLUSION FROM THE TMRS PENSION PLAN
 
 5
 A. The Equal Protection Clause.
 
 
 6
 Alford and Nierlich alleged that their exclusion from the City's TMRS pension plan denied them the equal protection of the laws as guaranteed by the Fourteenth Amendment to the Constitution of the United States. As the district court correctly pointed out, 484 F.Supp. at 1005-06, exclusion of the City employees from a pension program devised by a state legislature, administered by a state administrative agency, and adopted by a political subdivision of the state as part of its employee benefit scheme certainly constitutes the state involvement required to draw our scrutiny under the Fourteenth Amendment. See Burton v. Wilmington Parking Authority, 365 U.S. 715, 721-22, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961).
 
 
 7
 We also agree with the district court's determination that the proper standard under which we must review an allegation of age discrimination under the equal protection clause is the "rational basis" test. Massachusetts Board of Retirement v. Murgia, 427 U.S. 307, 312, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976). Accordingly, we must determine whether the Texas Legislature's exclusion of employees over age fifty from the TMRS is rationally related to a legitimate, articulated state purpose. E. g., San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 17, 93 S.Ct. 1278, 1288, 36 L.Ed.2d 16 (1973); Seoane v. Ortho Pharmaceuticals, Inc., 660 F.2d 146 at 150 (5th Cir. 1981). As the Supreme Court characterized this type of inquiry in Murgia, however, it "employs a relatively relaxed standard reflecting the Court's awareness that the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one. Perfection in making the necessary classifications is neither possible nor necessary." 427 U.S. at 314, 96 S.Ct. at 2567. With this admonition in mind, we conclude that the district court erred in holding that the TMRS program denied Alford and Nierlich the equal protection of the laws.
 
 
 8
 The City and TMRS adduced at trial, and have reiterated in this appeal, several reasons for the exclusion of employees hired after the age of fifty. First, they submit that participation in a pension plan by employees who have put in only a few years of service produces monthly payments so small as to be virtually meaningless. Second, they insist that the fifteen-year service requirement ensures that the pension program will serve as an incentive to younger employees and a reward to those of long standing. Third, they suggest that the administrative costs of including older newly-hired workers are prohibitive, especially when weighed against small monthly benefits resulting from such short-term deductions, and can only dissipate the funds available for providing fringe benefits to employees with long service. Finally, they remind us that the legislature is the appropriate body to draw the line between those employees who are to be rewarded for their lengthy tenure and those who are to be deemed as having not labored long enough.
 
 
 9
 As the district court noted in refuting this last contention, the social policies adopted by state legislatures remain subject to judicial scrutiny under the rational basis standard. 484 F.Supp. at 1007 (citing Murgia, supra, 427 U.S. at 312, 96 S.Ct. at 2566). We find, however, that the actions of the Texas Legislature in this instance are commensurate with our standard of limited review. "State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts may be conceived to justify it." McGowen v. Maryland, 366 U.S. 420, 425-26, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961).
 
 
 10
 The City and TMRS introduced persuasive testimony at trial to show that pension plans prescribing a term of years in service as a prerequisite to participation are a commonly accepted inducement for steady employment. Even without such evidence, we reasonably may suppose that the prospect of earning membership in a matched-funds benefits program, the participatory right vesting only after fifteen years of service, may not only attract capable employees but also may encourage them to remain. Having remained for the required fifteen years, the senior employee is rewarded with a fully vested interest in a mounting schedule of benefits culminating in a secure retirement. It must be remembered that the TMRS plan does not discriminate against older employees as a class; they are, in fact, its principal beneficiaries. Rather, it excludes only the newly-hired older worker who, the Legislature has determined, does not require the added incentive nor, having spent much of his working career elsewhere, merit the added reward.
 
 
 11
 Alford and Nierlich have argued cogently that the hardships imposed upon them by this plan are not essential to the state's aims. They have cast doubt upon the argument that a fifteen-year vesting requirement fosters continuity in employment by introducing evidence to show that the average tenure for employees hired after age fifty is comparable to that for younger employees because of turnover among the latter. They also suggest that the incentive of a pension is, if anything, more "meaningful" to the employee rapidly approaching retirement. Finally, they dispute the argument that the administrative cost of including older newly-hired employees is actuarially prohibitive.
 
 
 12
 We are not insensitive to the weight of these arguments, but their thrust is manifestly grounded in policy considerations which are the responsibility of legislative bodies. It is entirely possible that the TMRS could achieve its objective of inducing long service from the young-who, after all, could expect substantially higher benefits from a longer tenure-while yet offering some lesser retirement incentives to the newly-hired older worker. It is not for us, however, to decide if such policy considerations are superior. Even a conclusion that they are would not avail these retirees so long as the contrary policy, adopted by the legislature, was not wholly irrational. As we have observed before in rebuffing a challenge to discrepancies in a state retirement system, "(t)his argument is reasonable, but it is made in the wrong forum. It must be addressed to the (state) legislature." Anderson v. Winter, 631 F.2d 1238, 1241 (5th Cir. 1980). We cannot impose upon the state our view of what may constitute the fairest or most rational scheme. "In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect." Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970). See also Murgia, supra, 427 U.S. at 314, 96 S.Ct. at 2567. Since we believe that the TMRS policy of withholding membership from employees hired after age fifty constitutes a rational effort to promote the State's objective of encouraging and rewarding long service among municipal employees, we reverse the district court's holding that the statutory exclusion denied appellees Alford and Nierlich the equal protection of the laws.
 
 
 13
 B. The Age Discrimination in Employment Act.
 
 
 14
 The Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 623(a)(1) makes it unlawful for an employer
 
 
 15
 to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age ....
 
 
 16
 Section 4(f)(2) of the Act, 29 U.S.C. § 623(f)(2) provides that it is not unlawful for an employer
 
 
 17
 to observe the terms of a bona fide seniority system or any bona fide employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of this chapter, except that no such employee benefit plan shall excuse the failure to hire any individual ....
 
 
 18
 Before its amendment in 1978, the Act applied to individuals at least forty, but less than sixty-five years of age, 29 U.S.C. § 631.[5]
 
 
 19
 The district court found that the involuntary retirement of Alford and Nierlich with no pension benefits did not violate the ADEA because the City and TMRS acted pursuant to the terms of a bona fide retirement plan that was not a subterfuge to avoid the purposes of the Act. 484 F.Supp. at 1005. Alford and Nierlich have maintained throughout this dispute that a retirement plan is not bona fide within the meaning of section 4(f)(2) if it excludes newly-hired older workers from its benefits.[6] They insist, in other words, that a plan paying no benefits to a particular employee is not a bona fide plan with respect to that employee. Alternatively, appellees have argued that the TMRS plan is a subterfuge to avoid the purposes of the Act. Our own careful study of these arguments in light of the language of section 4(f)(2) and the legislative history of the Act has convinced us that the district court was correct in holding that the TMRS plan is bona fide within the meaning of section 4(f)(2) and is not a subterfuge to avoid the purposes of the Act.
 
 
 20
 In United Airlines, Inc. v. McMann, 434 U.S. 192, 98 S.Ct. 444, 54 L.Ed.2d 402 (1977), the Supreme Court held that section 4(f)(2) permits involuntary retirement of an employee prior to age sixty-five under a bona fide retirement plan. The Court also held that a plan established prior to the passage of the Act in 1967 cannot be a subterfuge to avoid its purposes, thereby rejecting the rule, adopted by the Fourth Circuit, "requiring an employer to show an economic or business purpose in order to satisfy the subterfuge language of the Act." 434 U.S. at 203, 98 S.Ct. at 450 (footnote omitted).
 
 
 21
 There is support for appellees' position, however in the interpretations of the Act adopted by the Department of Labor and the EEOC. On June 21, 1969, shortly after the passage of ADEA, the Department of Labor issued its Interpretive Bulletin, codified at 29 C.F.R. § 860.110(b), which provided that section 4(f)(2) of the Act "does not apply to the involuntary retirement before sixty-five of employees who are not participants in the employer's retirement or pension program." Since both Alford and Nierlich were over sixty-five when retired by the City, this interpretation was of no assistance to their cause. On May 25, 1979, however, after this case arose, the Department produced a more specific exegesis of section 4(f)(2), now codified at 29 C.F.R. § 860.120. Section 860.120(f)(iv)(A) flatly states that "(n)o employee hired prior to normal retirement age may be excluded from a defined contribution plan."[7] A defined contribution plan is one in which benefits are based upon the amount contributed to the participant's individual account. The TMRS plan adopted by the City is such a plan.
 
 
 22
 Although enforcement of the ADEA has since become the responsibility of the EEOC, the EEOC's own proposed interpretation of section 4(f)(2), to be codified at 29 C.F.R. Part 1625, incorporates the superseded section 860.120. See 44 Fed.Reg. 68862 (1979) (incorporating 44 Fed.Reg. 30658 (1979)). Thus, both the Department of Labor and the EEOC have taken the position that, with exceptions not applicable here, section 4(f)(2) does not permit an employer to exclude an older newly-hired worker from a defined contribution plan.
 
 
 23
 Nevertheless, after carefully reviewing the appellees' argument in light of the language of the statute and its legislative history, we conclude, contrary to the interpretation of the Department of Labor and the EEOC, that the TMRS retirement program is a bona fide employee benefit plan entitled to protection under section 4(f)(2) of the Act. The statutory language and the legislative history compel this conclusion.
 
 
 24
 The city's failure to pay retirement benefits to Alford and Nierlich was obviously in accordance with the terms of its regular TMRS program. Thus, the only question here is whether the City's plan is bona fide and is not a subterfuge to avoid the purposes of the Act. Past judicial interpretations of what constitutes a bona fide plan are not fully enlightening. As defined in Jensen v. Gulf Oil Refining & Marketing Co., 623 F.2d 406, 413 (5th Cir. 1980), "(a) retirement plan is bona fide if it is genuine and pays substantial benefits." The Supreme Court's extensive analysis of section 4(f)(2) in McMann, supra, accepted the employee's concession that the plan of which he complained was bona fide "in the sense that it exists and pays benefits." 434 U.S. at 194, 98 S.Ct. at 446. But it added further guidance by finding that such a plan could not be a subterfuge to violate the statute if it was created before the statute was adopted and not in anticipation of such a statute.
 
 
 25
 On this ambiguous precedent, we cannot accept appellees' argument that the City's TMRS program is not bona fide because it paid no benefits to them.
 
 
 26
 In explaining its conclusion that a benefit plan providing for retirement of an employee before age sixty-five could still be "bona fide" within the meaning of section 4(f)(2) of the ADEA even as to an employee forced to retire before age sixty-five, the Supreme Court noted indications in the legislative history of the Act that Congress had not intended for the ADEA to interfere with existing pension plans. It quoted Secretary of Labor Willard Wirtz assuring the Senate Subcommittee considering the bill "that the effect of the provision in 4(f)(2) ... is to protect the application of almost all plans which I know anything about.... It is intended to protect retirement plans." 434 U.S. at 199, 98 S.Ct. at 448 (quoting Hearings on S. 830 before the Subcommittee on Labor of the Senate Committee on Labor and Public Welfare, 90th Cong., 1st Sess. 53 (1967) (hereinafter referred to as Senate Hearings)). More important, the Court pointed out that section 4(f)(2) of the original bill authorized an employer "to separate involuntarily an employee under a retirement policy or system where such policy or system is not merely a subterfuge to evade the purposes of the Act...." Id.
 
 
 27
 The interpretation of the Act urged by TMRS is tellingly supported by the role Senator Javits played in the enactment of ADEA, again as reported by the Court in McMann. The present language permitting observance of a "bona fide employee benefit plan" was added in response to Senator Jacob Javits' concern that the original version "did not appear to give employers flexibility to hire older employees without incurring extraordinary expenses because of their inclusion in existing retirement plans." Id. at 199-200, 98 S.Ct. at 448-449. Senator Javits specifically suggested "that the age discrimination law should not be used as the place to fight the pension battle but that we ought to subordinate the importance of adequate pension benefits for older workers in favor of the employment of such older workers and not make the equal treatment under pension plans a condition of that employment." Id. at 200, 98 S.Ct. at 449. (quoting Senate Hearings 27.) The Court's opinion went on to characterize Senator Javits' amendment as "focus(ing) on the hiring of older persons notwithstanding the existence of pension plans which they might not economically be permitted to join." Id. at 202, 98 S.Ct. at 450.
 
 
 28
 Even more precisely on point are the remarks of Senator Yarborough, majority manager of the ADEA bill, in a dialogue with Senator Javits. As quoted by the Court in McMann, Senator Yarborough proposed the following scenario:
 
 
 29
 Say an applicant for employment is 55, comes in and seeks employment, and the company has bargained for a plan with its labor union that provides that certain moneys will be put up for a pension plan for anyone who worked for the employer for twenty years so that a 55-year-old employee would not be employed past 10 years. This means he cannot be denied employment because he is 55, but he will not be able to participate in that pension plan because unlike a man hired at 44, he has no chance to earn 20 years retirement. In other words, this will not disrupt the bargained-for pension plan.
 
 
 30
 113 Cong.Rec. 31255 (1967) (emphasis supplied) (quoted in 434 U.S. at 202 n.8, 98 S.Ct. at 450 n.8). The Senator's hypothetical situation almost exactly parallels the dispute in this case, except that the TMRS program adopted by the City was even less stringent; it permitted participation by those who could expect only fifteen years of employment.
 
 
 31
 Moving to the other side of the Congress, we find the House Report commenting that "(the section 4(f)(2)) exception serves to emphasize the primary purpose of the Bill-hiring of older workers-by permitting employment without necessarily including such workers in employee benefit plans. The specific exception was an amendment to the original bill, is considered vita(l) to the legislation, and was favorably received by witnesses at the hearings." H.R.Rep.No.805, 90th Cong., 1st Sess. 4 (1967), reprinted in (1967) U.S.Code Cong. & Ad.News 2213, 2217 (emphasis added).
 
 
 32
 In sum, our review of the Act's origins convinces us that Congress sought to avoid using this legislation as the ground on which "to fight," in Senator Javits' words, "the pension battle." Rather, Congress was only too aware of the danger involved in drastically altering, in one barely considered proviso, the many pension plans already operative in 1967.[8] Not until 1974, in the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001-1381, did Congress address the problems of exclusions, long vesting periods, and adequate pensions. Section 202(a)(2) of ERISA 29 U.S.C. § 1052(a)(2), provides that, with few exceptions, "(n)o pension plan may exclude from participation (on the basis of age) employees who have attained a specified age ...." Sections 201 through 211, 29 U.S.C. §§ 1051-1061, set forth a detailed scheme of minimum participation and vesting standards. These complexities of ERISA demonstrate the pension battle necessarily was a separate struggle and that Congress in 1967 intended to leave established pension plans-and the TMRS plan is surely one of a type common at that time-intact until it could consider fully these different issues. The outcome of this pension battle further thwarts Alford's and Nierlich's claims since ERISA is quite clear in exempting pension plans of governmental agencies, 29 U.S.C. §§ 1002(32), 1003(b)(1), and Congress has not dealt with governmental pension plans in subsequent legislation. We conclude, therefore, that the TMRS plan is a bona fide plan within the meaning of section 4(f)(2) of the ADEA.
 
 
 33
 Strong support for this conclusion can also be found in the Supreme Court's treatment of a comparable exemption for "bona fide seniority systems" under section 703(h) of the Civil Rights Act of 1964, Title VII, 42 U.S.C. § 2000e-2(h). In International Brotherhood of Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), the Court rejected the government's argument, based upon official Equal Employment Opportunity Commission policy, that no seniority system perpetuating the effects of pre-Act discrimination could be bona fide. Resorting to the legislative history of Title VII for explication of the term "bona fide," the Court determined that Congress had framed the section 703(h) exception in response to concern over the disruptive effect that Title VII might have on existent seniority systems:
 
 
 34
 It is apparent that § 703(h) was drafted with an eye toward meeting the earlier criticism on this issue with an explicit provision embodying the understanding and assurances of the Act's proponents, namely, that Title VII would not outlaw such differences in treatment among employees as flowed from a bona fide seniority system that allowed for full exercise of seniority accumulated before the effective date of the Act.
 
 
 35
 431 U.S. at 352, 97 S.Ct. at 1863. The Court thus concluded that it could not "accept the invitation to disembowel § 703(h) by reading the words 'bona fide' as the Government would have it do." Id. at 353, 97 S.Ct. at 1863. See also W.R. Grace & Co. v. Local Union No. 759 Int'l. Union of United Rubber, Cork, Linoleum and Plastic Workers of America, 652 F.2d 1248, 1252, 1256 (5th Cir. 1981).
 
 
 36
 Finally, we conclude that the TMRS program is not a subterfuge to avoid the purposes of the Act. The Supreme Court clearly held in McMann that a bona fide retirement plan in effect prior to passage of the ADEA cannot be subterfuge to avoid that Act's purposes. 434 U.S. at 203, 98 S.Ct. at 450. See also Jensen v. Gulf Oil Refining & Marketing Co., 623 F.2d 406, 413 (5th Cir. 1980). The passage of TMRS by the Texas Legislature in 1947 and the City's adoption of it in 1950 frees the program at issue here from any further scrutiny. The TMRS plan does not violate the Age Discrimination in Employment Act.
 
 
 37
 II. THE CITY'S FAILURE TO PAY FOR ACCRUED SICK LEAVE
 
 
 38
 The district court also held that the City's refusal to pay Alford and Nierlich for their ninety days of accrued sick leave violated the ADEA. 484 F.Supp. 1004-05. We agree. The section 4(f)(2) exemption for bona fide employee benefit plans, discussed at length in Part I(A), supra, does not shield the City's discriminatory policy of withholding accrued sick leave pay from employees hired after age fifty and thus ineligible for retirement under the TMRS plan. The City's sick leave policy forms no part of the TMRS pension plan.[9] The City has undertaken to make eligibility for sick leave pay contingent upon unrelated eligibility for TMRS. This discriminatory administration of a simple fringe benefit cannot by this means be brought under the protection of section 4(f)(2).
 
 
 39
 The City has defended its position by urging us to consider its sick pay provision as just another part of its "employee benefit plan," even though that provision is not contained in the TMRS and is functionally irrelevant to any "retirement, pension, or insurance plan." We decline to interpret section 4(f)(2) so expansively. True, we have stated before that the key phrase of section 4(f)(2) is "employee benefit plan" and that "(t)he words, 'retirement, pension, or insurance,' are added in a clearly descriptive sense, not excluding other kinds of employee benefit plans if, conceivably, there could be any." Brennan v. Taft Broadcasting Co., 500 F.2d 212, 215 (5th Cir. 1974).[10] However, we do not believe that Congress, in developing the ADEA exemption for employee benefit plans, see Part I(A), supra, meant to countenance the discriminatory dispensation of all fringe benefits whether or not they are part of a specific and established "benefit plan."
 
 
 40
 As we have undertaken to explain in detail in Part I(A), supra, Congress devised section 4(f)(2) in order to postpone any disruptive effects upon the many complicated pension plans already in force at that time until it could tackle the issue in more considered and comprehensive legislation. The multifaceted TMRS retirement program is, we have held, just such a plan; the City's policy of paying a retiring employee for up to ninety days of unused sick leave-a simple fringe benefit administered in a single, easily calculated payment-is not. Rather, the payment for unused sick leave is akin to the other extra-TMRS fringe benefits that the City voluntarily pays its employees regardless of the age at which they are hired.[11] Lacking the protection of section 4(f)(2), the City's denial of well-earned payment for unused sick leave to this class of older employees violates section 4(a)(1) of the ADEA, 29 U.S.C. § 623(a)(1).[12] We affirm the district court's judgment awarding Alford and Nierlich payment for their accrued sick leave as of December 31, 1977, with appropriate interest.
 
 
 41
 Having resolved this issue in favor of appellees under the ADEA, we need not address the City's argument that its denial of sick leave payments did not violate the equal protection clause.
 
 III. ATTORNEY'S FEES
 
 42
 Appellees contend that the district court erred in denying them attorney's fees under 42 U.S.C. § 1988 when they actually were requesting, and were entitled to, such fees under an entirely different statute, 29 U.S.C. § 626(b). We cannot consider this contention. Appellees filed no cross-appeal from the judgment denying them attorney's fees, but merely raised the issue as a cross-point in their answering brief. In the absence of a cross-appeal, an appellee cannot "attack the (district court's) decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary ...." Morley Construction Co. v. Maryland Casualty Co., 300 U.S. 185, 191, 57 S.Ct. 325, 328, 81 L.Ed. 593 (1937). This rule has been applied specifically to requests for the granting of attorney's fees, Hadfield v. Ryan Equipment Co., 456 F.2d 1218, 1222 (8th Cir. 1972), for the denial of attorney's fees, Fain v. Caddo Parish Police Jury, 564 F.2d 707, 709 n.3 (5th Cir. 1977), and for an increase in attorney's fees, White v. Travelers Indemnity Co., 416 F.2d 870, 874 (6th Cir. 1969); North Texas Producers Association v. Metzger Dairies, Inc., 348 F.2d 189, 196-97, cert. denied, 382 U.S. 977, 86 S.Ct. 545, 15 L.Ed.2d 468 (1966). The district court's denial of attorney's fees must be affirmed.
 
 
 43
 We reverse the judgment of the district court awarding retirement pension benefits to appellees Alford and Nierlich. We hold that their exclusion from the TMRS pension program did not deny them the equal protection of the laws. In all other respects, the judgment below is affirmed.
 
 
 44
 REVERSED IN PART; AFFIRMED IN PART.
 
 
 
 *
 Former Fifth Circuit case, Section 9(1) of Public Law 96-452-October 14, 1980
 
 
 [1]
 The Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 631 originally covered employees at least 40 years of age, but less than 65. A 1978 amendment, however, raised the maximum age to "less than 70." Pub.L.No.95-256, § 3(a), 92 Stat. 189 (1978)
 
 
 [2]
 In conformity with the 1978 amendments to the ADEA, see note 1, supra, TMRS was amended to exclude only employees hired at age 55 or over, i. e. those who typically cannot hope to serve fifteen years before reaching mandatory retirement at 70. Tex.Rev.Civ.Stat. art. 6243h, § III(2)(b) (Vernon Supp. 1980-1981). This lawsuit commenced prior to this change, however, and the statute in dispute is the pre-1979 version of TMRS
 
 
 [3]
 The City has raised its mandatory retirement age to 70, in conformity with the 1978 amendments to the ADEA. See note 1, supra
 
 
 [4]
 The district court treated the state constitutional issue jointly with the federal claim, noting the "similarity in meaning and impact" of the state and federal equal protection clauses. 484 F.Supp. at 1005. It denied any relief under Art. 6252-14. Id. Appellees have not urged these claims as alternative grounds in support of their judgment, nor have the issues been discussed in the briefs or at oral argument. Consequently, we do not address them here
 
 
 [5]
 See note 1, supra
 
 
 [6]
 Having reversed the district court's judgment for Alford and Nierlich on the equal protection issue, we will consider appellees' alternative contention, omitted from their brief but thoroughly argued at trial and reiterated at oral argument, that their exclusion from the City's TMRS plan violated the ADEA
 While an appellee cannot secure alteration or modification of claims decided adversely to him in a lower court without bringing a cross-appeal, he is free to support the judgment secured below with any matter appearing in the record, including contentions, arguments, or theories specifically repudiated by the lower court as a basis for allowing his claim.
 City of Safety Harbor v. Birchfield, 529 F.2d 1251, 1254 n.4 (5th Cir. 1976) (citations omitted).
 
 
 [7]
 The section provides for certain exceptions to this rule, as follows:
 With respect to defined benefit plans not subject to the Employee Retirement Income Security Act (ERISA), Pub.L. 93-406, 29 U.S.C. 1001, 1003(a) and (b), an employee hired at an age more than 5 years prior to normal retirement age may not be excluded from such a plan unless the exclusion is justifiable on the basis of cost considerations as set forth elsewhere in this section. With respect to defined benefit plans subject to ERISA, such an exclusion would be unlawful in any case. An employee hired less than 5 years prior to normal retirement age may be excluded from a defined benefit plan, regardless of whether or not the plan is covered by ERISA. Similarly, any employee hired after normal retirement age may be excluded from a defined retirement plan.
 
 
 [29]
 C.F.R. § 860.120(f)(iv)(A) (1980)
 
 
 [8]
 According to a statement prepared by Anthony Obadal, U.S. Chamber of Commerce, and submitted to the Senate Subcommittee, "of approximately sixteen thousand pension plans surveyed in 1965, the Department of Labor asserted that 'Maximum participation ages were effective in over three-fourths of the plans with over three-fifths of the workers.' One-third of the private pension plans surveyed exclude workers hired at age 55 and over half at age 60." Senate Hearings 106. (Footnote omitted)
 
 
 [9]
 At trial, the court and counsel for appellees elicited the following explanation from an Assistant Director of Personnel for the City:
 The court: Is this sick leave pay a part of the Texas Municipal Retirement System?
 The witness: No, it is not.
 The court: This is a separate policy of the City government, right?
 The witness: It is a separate policy.
 Q (by Mr. Griffith:) In other words, this ninety days comes out of the City treasury without regard to contributions to retirement system, is that right?
 A: It is completely separate.
 Q: There is no provision in the Texas Municipal Retirement System for sick leave at all, is there?
 A: No, there is not.
 
 
 [10]
 Our opinion in Brennan refuted the Secretary of Labor's contention that an employer's "Profit Sharing Retirement Plan" was not a "retirement, pension, or insurance plan" within the meaning of § 4(f)(2). Apart from the inclusion of the words "profit sharing" in its title, the plan was just like any other complex retirement package protected by the Act. See 500 F.2d at 214-15. Read in context, therefore, our explanation of § 4(f)(2)'s key phrase was directed only toward warding off any absurd emphasis on nomenclature. We did not suggest that § 4(f)(2) exempts all fringe benefits from scrutiny under the Act
 
 
 [11]
 These benefits include increases in stability or longevity pay, vacation periods and payment for certain unused vacation time (which appellees received), holiday pay, and insurance coverage. 484 F.Supp. at 1003-04
 
 
 [12]
 The City also argues that its sick leave payment policy cannot violate the ADEA because it is tied to length of service, not to age. This is somewhat disingenuous. An employee who hires on at age 49, and thus is eligible for retirement under TMRS, receives payment for the full ninety days when he retires, whatever his length of service. An employee hiring on one day past the magical age limit of fifty, however, receives nothing for meritorious attendance-again, regardless of how long he has served. We do not mean to suggest that the City cannot in any way scale its fringe benefits, such as vacation time or sick leave, according to length of service. We merely hold that it may not deny an entire class of older employees-those hired after age fifty-any participation in a fringe benefit unrelated to a bona fide "retirement, pension, or insurance" plan simply by artificially trying to tie the benefit to such a plan