Carl M. MILES, et al., Plaintiffs,

v.

CITY COUNCIL OF AUGUSTA,
GEORGIA, et al., Defendants.

Civ. A. No. CV181–157.

United States District Court,
S.D. Georgia,
Augusta Division.

Nov. 15, 1982.

John H. Ruffin, Jr., Augusta, Ga., for plaintiffs.

Stanley G. Jackson, Augusta, Ga., for defendants.

## ORDER

BOWEN, District Judge.

This case is before the Court on the cross-motions for summary judgment of plaintiffs Carl and Elaine Miles and defendant City Council of Augusta, Georgia. For the reasons to follow, summary judgment is GRANTED IN FAVOR OF DEFENDANT AND DENIED AS TO THE PLAINTIFFS. The plaintiffs' motion will be discussed first.

## I

## PLAINTIFFS' MOTION

In this case, the attack upon the power of the City of Augusta to levy an occupation tax arises under somewhat unusual circumstances. The pertinent undisputed facts, as gleaned from the record,[1] are as follows:

### A. The Cat

Carl and Elaine Miles are an unemployed, married couple who own "Blackie, The Talking Cat." Trained by Carl Miles, Blackie allegedly is able to speak several words and phrases of the English language. On June 22, 1981, plaintiffs were required by defendant to obtain a business license. From May 15, to June 22, 1981, plaintiffs had accepted contributions from pedestrians in the downtown Augusta area who wanted to hear the cat speak. People would stop the plaintiffs who strolled the streets with the cat. Upon being stopped, plaintiffs would ask for a contribution. There is, however, evidence of the plaintiffs soliciting an off-duty policeman for money in exchange for a performance. Plaintiffs dispute this allegation. It is undisputed that plaintiffs would ask for, and lived off, the contributions received for Blackie's orations. Several complaints were received by the Augusta Police Department regarding the plaintiffs' solicitations. Plaintiffs were warned by the police not to solicit unless they first obtained a business license.

Through their exploit of his talents, Blackie has provided his owners with at

1. In ruling on the motions for summary judgment, the Court has considered only the evidence in the file. However, it should be disclosed that I have seen and heard a demonstration of Blackie's abilities. The point in time of the Court's view was late summer, 1982, well after the events contended in this lawsuit. One afternoon when crossing Greene Street in an automobile, I spotted in the median a man accompanied by a cat and a woman. The black cat was draped over his left shoulder. Knowing the matter to be in litigation, and suspecting that the cat was Blackie, I thought twice before stopping. Observing, however, that counsel for neither side was present and that any citizen on the street could have happened by chance upon this scene, I spoke, and the man with the cat eagerly responded to my greeting. I asked him if his cat could talk. He said he could, and if I would pull over on the side street he would show me. I did, and he did. The cat was wearing a collar, two harnesses and a leash. Held and stroked by the man Blackie said "I love you" and "I want my Mama." The man then explained that the cat was the sole source of income for him and his wife and requested a donation which was provided. I felt that my dollar was well spent. The cat was entertaining as was its owner. Some questions occurred to me about the necessity for the multiple means of restraint and the way in which the man held the cat's paw when the cat was asked to talk. However, these are not matters before the Court and are beyond the purview of a federal judge. I do not know if the man whom I saw with the cat was the plaintiff Mr. Miles.

This sequence has not been considered as evidence or as an uncontroverted fact in the case. It is simply stated for the purpose of a disclosure to the parties of the chance contact.

least the minimal necessities of life.[2] Plaintiff Carl Miles has entered into several contracts with talent agents in Georgia, South Carolina and North Carolina. These agents have paid, at least in part, the Miles' living expenses over a period of time. The evidence does not clearly show that this support was provided during the relevant time period of May 15th to June 22nd. It does, however, permit the inference that prior to the plaintiffs' arrival in Augusta, they intended to commercially exploit Blackie's ability.

### B. The Ordinance

Under its charter the City of Augusta is empowered to impose license taxes. Section 139 of the charter states, in pertinent part:

> The City Council of Augusta, by ordinance, may require any person, firm or corporation to pay a license tax upon any occupation, trade or business followed or carried on within the corporate limits of the City of Augusta. . . .

Pursuant to this enabling provision, the City Council enacted Ordinance No. 5006, the 1981–1982 business license ordinance. The ordinance exhaustively lists the trades, businesses and occupations subject to the ordinance and the amount of tax to be paid. Although the ordinance does not provide for the licensing of a talking cat,[3] section 2 of the ordinance does require any "Agent or Agency not specifically mentioned . . ." to pay a $50.00 tax.

### C. The Attack

Plaintiffs attack the ordinance as being unconstitutionally vague and overbroad in contravention of the Due Process clauses of the fourteenth amendment to the United States Constitution and of the Georgia Constitution. Ga.Code Ann. § 2–101.[4] They contend they are not required to obtain a license and that requiring them to do so before they may solicit on the streets violates their first amendment rights of speech and association as well as the right to equal protection secured by the fourteenth amendment. Prefatory to the analysis of plaintiffs' vagueness and overbreadth challenges the nature of the ordinance being challenged and the authority to enact it must be established.

The purpose behind the ordinance questioned in this case is to generate revenue. It is a tax on occupations and businesses.

---

**2.** That a talking cat could generate interest and income is not surprising. Man's fascination with the domestic feline is perennial. People of western cultures usually fall into two categories. Generally, they are ailurophiles or ailurophobes. Cats are ubiquitous in the literature, lore and fiber of our society and language. The ruthless Garfield commands the comic strips, the Cat in the Hat exasperates even Dr. Seuss, and who hasn't heard of Heathcliff, Felix or Sylvester? Historically, calico cats have eaten gingham dogs, we are taught that "a cat can look at a king" and at least one cat has "been to London to see the Queen."

It is often said that imitation is the sincerest form of flattery. To the animal world, I am sure that the sincerest form is anthropomorphosis. The ailurophobes contend that anthropomorphosis abounds, and that it is the work of ailurophiles. The ailurophiles say that they do not anthropomorphize cats but, rather, that cats have such human qualities as they may condescend to adopt for their own selfish purposes. Perhaps such was the case with Saki's ill-fated Tobermory, the cat who knew too much and told all, who, when asked if the human language had been difficult to learn, ". . . looked squarely at [Miss Resker] for a

moment and then fixed his gaze serenely on the middle distance. It was obvious that boring questions lay outside his scheme of life."

For hundreds, perhaps thousands of years, people have carried on conversations with cats. Most often, these are one-sided and range from cloying, mawkish nonsense to topics of science and the liberal arts. Apparently Blackie's pride does not prevent him from making an occasional response to this great gush of human verbiage, much to the satisfaction and benefit of his "owners." Apparently, some cats do talk. Others just grin.

**3.** It seems doubtful that the city fathers would anticipate the need for a specific category of this sort.

**4.** Plaintiffs do not address their state constitutional claims in their summary judgment motion, but merely state that the federal constitutional arguments apply to the state claims. Because of the similarity of the two claims and the legal principles applicable to both, only the federal claims will be discussed, inasmuch as the result is the same under the state claim.

The preamble to Ordinance No. 5006 (the ordinance) states, in part, "An ordinance to fix the annual and specific taxes and licenses of the City of Augusta on Business Occupations and Professions ...." Clearly, the ordinance does not have as its sole purpose the regulation of solicitation per se, as did the ordinances and laws in the cases of, *e.g. Hynes v. Mayor of Oradell,* 425 U.S. 610, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976); *Martin v. Struthers,* 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943); *Schneider v. State,* 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939). The thrust of the ordinance is directed, not at speech and association, but at the generation of revenue through the imposition of an occupation tax.

█ The power of the defendant to levy an occupation tax is unquestionable. The city charter authorizes the very ordinance passed by the defendant council. The taxing power, as embodied in a municipality's charter, is well recognized as a means for raising revenue. *Pharr Road Investment Co. v. City of Atlanta,* 224 Ga. 752, 164 S.E.2d 803 (1968). The taxing power is a power of the state that is delegated to the municipality it creates. *See Hoyt Civic Club v. City of Tuscaloosa,* 439 U.S. 60, 71, 99 S.Ct. 383, 390, 58 L.Ed.2d 292 (1978). License fees, or occupation taxes, placed upon trades and occupations are a legitimate method of taxation, *Allied Stores of Ohio v. Bowers,* 358 U.S. 522, 526, 79 S.Ct. 437, 440, 3 L.Ed.2d 480 (1959), even though such a tax may render a business unprofitable. *Pittsburgh v. Alco Parking Corp.,* 417 U.S. 369, 373, 94 S.Ct. 2291, 2294, 41 L.Ed.2d 132 (1974). Moreover, the amount of tax levied against different trades and businesses need not be uniform or the result of the application of a precise scientific formula. *Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U.S. 356, 359, 93 S.Ct. 1001, 1003, 35 L.Ed.2d 351 (1973). Thus, it is clear the city council is authorized to require the procurement of business licenses. The ordinance is not one designed to regulate speech or association, but merely to raise revenue. The ordinance does not subject anyone's speech or associational activity to any penalty unless committed within the context of one's occupation for which a tax has not been paid. Thus, the ordinance does not tread upon plaintiffs' fundamental constitutional rights.

█ Having established the character and scope of the ordinance, the framework for scrutinizing plaintiffs' vagueness and overbreadth challenges must next be determined. The ordinance in question, though merely a tax law, does impose a penalty for failure to pay. Section 12 of the ordinance provides for a fine or imprisonment for failure to obtain the required license. Although the ordinance may be viewed as only civil in nature, because of the authorized penalty it is, perhaps, more appropriate under the facts of this case to apply the higher standard of specificity required in the drafting of penal statutes to this ordinance in determining its constitutionality. To avoid constitutional vagueness, a statute must provide "an ascertainable standard of guilt sufficient to enable persons of ordinary intelligence" to have fair warning of the conduct proscribed by the law. *High Ol'Times, Inc. v. Busbee,* 673 F.2d 1225, 1229 (11th Cir.1982). Exacting attention to detail in drafting is not required. *Id.* Also, as pointed out in *High Ol'Times,* a court may avoid vagueness by means of statutory interpretation. If a statute can be read in a constitutional manner, it must be accorded that reading. *Id.* Lastly, if the statute does not define its terms, the ordinary and common meanings are applied, unless there is an established technical meaning, or the legislative body intended otherwise. *Id.*

█ Applying these tenets to the ordinance in question, unconstitutional vagueness does not appear. The ordinance requires all persons, firms or corporations engaged in the enumerated occupations to pay the prescribed tax. Plaintiffs' occupation is not listed but, according to defendant, falls under the category of "Agent or Agency not specifically mentioned ...." Plaintiffs assert they must speculate, at their peril, as to the meaning of this language. They also contend the discretionary power of the mayor to require a business license, as au-

thorized in section 4 of the ordinance, falls within the void for vagueness doctrine.

At the outset, it is noted an exhaustive list of businesses, occupations and trades subject to taxation is contained in the ordinance. Equally important to note is the practical impossibility of specifying, with particularity, each and every occupation, trade or business, that would conceivably come within the ambit of the ordinance. Plaintiffs cannot reasonably argue that before the defendant can require a business license for a talking cat, it must specifically provide for such an occupation in its ordinance. The self-evident thrust of the ordinance is to tax occupations, businesses and trades that derive income from the practice of that occupation, business and trade in the marketplace. In other words, where a person, firm or corporation engages in regular commercial activity with the public for the purpose of gaining economic benefits or advantages, that person, firm or corporation is subject to the ordinance. Given the exhaustive detailing of the wide variety of occupations and businesses covered, it requires no great leap in logic to hold that a "catch-all" category is intended for those unique, extraordinary occupations, such as plaintiffs' talking cat, used to obtain economic benefits.

Plaintiffs' contention that they are not required to obtain a license carries the implication that they are not engaged in an occupation. In their brief, plaintiffs cite several definitions of the terms "occupation" and "business." The general import of these definitions is that one is engaged in an occupation or business when that work or activity occupies one's time or attention on a regular basis for profit or support. See United States v. King, 532 F.2d 505, 510 (5th Cir.1976); Southern Guaranty Insurance Company v. Duncan, 131 Ga.App. 761, 764, 206 S.E.2d 672 (1974). Inasmuch as the ordinance does not define "occupation" or "business", the common definition cited above applies. High Ol'Times, supra. Plaintiffs' activity, regardless of its peculiarity, falls within this definition.

Carl Miles, in his deposition of April 23, 1982, stated at pages 35–36 that prior to June 22, 1981, he would ask for a contribution when people asked to hear his cat talk. From May 15, 1981, to June 22nd, he received enough contributions, usually $.25 or $.50 each, to pay his weekly rent of $35.00 and purchase other necessities, except for a two-week period in which he used money from his savings. Miles Deposition, at p. 38. He and his wife were otherwise unemployed, with no other income. Plaintiffs would walk, with the cat, in the vicinity of Broad and Greene Streets, major avenues of motorized and pedestrian traffic, for several hours a day. Deposition of Elaine Miles, at p. 13. Thus, they were regularly engaged in a pursuit yielding income however small.

The plaintiffs' commercial interest in Blackie is well established. It is undisputed that before they moved to Augusta and after the business license was obtained, Carl Miles entered into several agreements with talent, or booking, agencies in South Carolina, North Carolina and Georgia. Carl Miles Deposition, at pp. 6–7, 21–23. Prior to June 22nd, Blackie appeared on television and radio. For example, in 1980 Blackie appeared on "That's Incredible," a nationally televised program, for $500.00. Also, plaintiffs' living expenses have been paid in part by at least one promotional agency who had contracted with Carl Miles. Although the activity recounted here occurred either prior to the plaintiffs' move to Augusta or after June 22nd, it is relevant to show the interest plaintiffs had in exploiting Blackie on a commercial basis. This interest coupled with the near daily receipt of contributions requested by the plaintiffs for performances by the cat brings them well within the definition of occupation. Furthermore, the question of obtaining a business license was not new to Carl Miles. He had on previous occasions, in Charlotte and Columbia, inquired as to the necessity of a license. Deposition, at pp. 19–20. He, therefore, viewed his exploitation of the cat as a business activity for which a license might be required. The fact that those cities did not require a license does not alter

the nature of his activity or prevent the City of Augusta from requiring one. Since they did not hold themselves out as a charity, the plaintiffs cannot persuasively argue that their activity did not require a license. The ordinance is not impermissibly vague.

With respect to section 4 of the ordinance which grants the mayor discretionary power to require a license, it is unnecessary to address plaintiffs' vagueness attack. Nowhere in the record does it appear that this section was invoked to require plaintiffs' licensing. The licensing requirement came from section 2 of the ordinance. Even if section 4 were declared void for vagueness, it would not affect the outcome of this case inasmuch as it was not applied to plaintiffs and its demise would not affect the validity of section 2. *See Broadrick v. Oklahoma,* 413 U.S. 601, 610, 93 S.Ct. 2908, 2914, 37 L.Ed.2d 830 (1973).

■ Plaintiffs next attack the ordinance on the ground it is overly broad. As stated by the Supreme Court in *Broadrick v. Oklahoma, supra,* at 615, 93 S.Ct. at 2917, before a statute is invalid for overbreadth, "the overbreadth of [the] statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." (Brackets added). The business license ordinance is a legitimate exercise of the city's taxing power, as delegated by the state. It covers activities that rightfully fall within the definition of trade, business and occupation. To prevail, plaintiffs must show that their conduct is constitutionally protected, *i.e.,* exempt from taxation. Plaintiffs cite no authority that holds commercial solicitation exempt from taxation. Plaintiffs' conduct is not barred by the ordinance so long as they do not seek contributions. Once their activity becomes a commercial venture, it falls within the legitimate sweep of the ordinance. Also, the criminal activity is not the plaintiffs' solicitation of money for Blackie's performances, but *doing so without a license.* Plaintiffs cannot contend that the ordinance impermissibly infringes upon their right to association since this right does not extend to commercial ventures. *Stratton v.*

*Drumm,* 445 F.Supp. 1305, 1309 (D.Conn. 1978); *Brown v. Haner,* 410 F.Supp. 399 (W.D.Va.1976); *See Pollard v. Cockrell,* 578 F.2d 1002, 1016 (5th Cir.1978). Accordingly, the business license ordinance does not suffer from overbreadth.

## II

### DEFENDANT'S MOTION

■ Defendant City Council of Augusta filed its own motion for summary judgment. Most issues raised in its motion have been sufficiently covered in the discussion of the plaintiffs' motion. Repetition will be of little benefit. One point raised in defendant's motion that needs to be briefly addressed refers to plaintiffs' claim that their right to equal protection was violated by the license requirement. The plaintiffs' contention is without merit, and defendant must prevail.

■ Plaintiffs fail to show the manner in which they were denied equal protection. There is no evidence of purposeful discrimination, if there was any discrimination at all. Furthermore, the ordinance is not arbitrary and without rational foundation. The fact that the ordinance does not specifically mention a "talking cat" but instead contains a catch-all clause does not, under the circumstances, raise the requirement of a license to the level of an equal protection violation. Also, the fact the plaintiffs' tax was a different amount than that required of other businesses does not constitute a violation. Revenue laws of states and municipalities do not have to be applied uniformly class to class. *Lehnhausen, supra.* The resultant inequality does not render the ordinance unconstitutional in the case at bar. *See Alford v. City of Lubbock, Texas,* 664 F.2d 1263 (5th Cir.1982). Only if the plaintiffs demonstrate that the ordinance as applied to them is a form of "hostile and oppressive discrimination" will the ordinance fall. *Lehnhausen, supra,* 410 U.S. at 364, 93 S.Ct. at 1006. As no such showing has been made by the plaintiffs, the ordinance retains its presumption of validity. *Alford, supra,* at 1266.

## CONCLUSION

As demonstrated in both motions for summary judgment, there is no genuine issue of material fact existing in this case. Consideration was limited, therefore, to entitlement of judgment as a matter of law. Under the facts and the applicable law, defendant prevails. The ordinance challenged by the plaintiffs is constitutionally valid depriving them of neither due process nor equal protection. The ordinance is a legitimate, rational means for the generation of revenue for the benefit of the defendant. It does not trammel the fundamental rights of the plaintiffs as guaranteed by the state and federal constitutions.

Accordingly, in consideration of the foregoing findings and conclusions, plaintiffs' motion for summary judgment is DENIED. Judgment is, however, granted in favor of the defendant City Council of Augusta on all issues.

The remaining defendant, M.D. Philpot, was sued individually and in his capacity as Chief of Police for the City of Augusta. He, too, should have judgment granted in his favor. Although he is not a party to the City Council's summary judgment motion, the claims against Chief Philpot are ripe for decision. Plaintiffs have not produced any evidence to show that the officers of the Augusta Police Department did not act properly and within their lawful authority. Moreover, there has been no showing that defendant Philpot personally harassed the plaintiffs or directed such unlawful activity. Finally, in an action brought under 42 U.S.C. § 1983 he may not be sued under the theory of *respondeat superior.*

Therefore, consonant with the findings of fact and conclusions of law recited in this order on motion of the City Council, the defendant M.D. Philpot is granted judgment in his favor, both individually and in his official capacity as Chief of Police, on all claims. The parties shall each bear their own costs.